FILED

2009 Oct-06  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JOHN M. MCCLELLAN, Individually and On Behalf of All Others Similarly Situated, ) <br> ) <br> *Plaintiff,* ) <br> ) <br> v. ) <br> ) <br> REGIONS FINANCIAL CORPORATION, ) <br> C. DOWD RITTER, JACKSON W. ) <br> MOORE, IRENE ESTEVES, ALTON E. ) <br> YOTHER, D. BRYAN JORDAN, ) <br> RONALD C. JACKSON, RICHARD D. ) <br> HORSLEY, ALLEN B. MORGAN JR., ) <br> SAMUEL BARTHOLOMEW, JR., ) <br> GEORGE W. BRYAN, MARGARET H. ) <br> GREENE, SUSAN W. MATLOCK, ) <br> JORGE M. PEREZ, DR. MALCOLM ) <br> PORTERA, JOHN R. ROBERTS, ) <br> MICHAEL S. STARNES, LEE J. ) <br> STYSLINGER III, ROBERT R. WALLER, ) <br> SPENCE L. WILSON, HARRY W. WITT, ) <br> MERRILL LYNCH, PIERCE FENNER ) <br> & SMITH, INCORPORATED, and ) <br> ERNST & YOUNG, LLP ) <br> ) <br> ) <br> ) <br> *Defendants.* ) | CIVIL ACTION NO. _____ <br><br><br><br><br><br><br><br><br> CLASS ACTION COMPLAINT <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

### INTRODUCTION

1.     This securities class action is filed against Regions Financial Corporation ("Regions" or "the Company"; NYSE Ticker Symbol: RF); several of its current and former officers and members of the Board of Directors (the "Individual Defendants"); Merrill Lynch, Price, Fenner & Smith, Incorporated ("Merrill Lynch"), Regions' financial advisor; and Ernst & Young LLP ("E&Y"), which served as outside auditor to both Regions and AmSouth.

2.     The action arises from these defendants' conduct in connection with their causing, approving, and/or acquiescing in the approximately $10 billion acquisition by Regions of AmSouth Corporation ("AmSouth"") in November 2006.  The defendants allowed or authorized the solicitation of proxies or consent to a resolution approving a merger/acquisition between Regions and AmSouth through the use of a materially misleading joint proxy statement.  The joint proxy statement urged shareholders to vote for the merger/acquisition.   However, the statement omitted material facts about and/or falsely misrepresented AmSouth's and Regions' financial condition.  The statement also omitted material facts and/or contained false material representations about the benefits of merging the two banks into a single operation, the risks attended with such merger/acquisition or the fairness of the transaction to Regions shareholders.

3.     Both prior to and after the merger/acquisition the defendants permitted the filing of false financial statements with the Securities Exchange Commission (SEC) that concealed the true financial condition of AmSouth and Regions prior to the acquisition and then the true financial condition of Regions post merger/acquisition.   The false pre-merger financial statements were incorporated into the joint proxy statement and used to persuade shareholders about the benefits of the proposed combination and/or conceal the risks associated with the transaction.   The post-acquisition financial statements concealed the fact that Regions' acquisition of AmSouth substantially harmed Regions' shareholders and that defendants knew or should have known that the transaction was ill-advised when they strongly urged shareholders to approve the transaction.

4.     The Company was finally forced in January 2009 to announce a $6 billion write down of goodwill attributable to the AmSouth merger/acquisition, approximately 60% of the $10 billion purchase price.  Regions has since been sued in a class action brought by investors under

the federal securities laws in connection with their purchases of securities offered by Regions in the Company's April 2008 Offering claiming Regions is strictly liable for their damages and seeking rescission.

**THE PARTIES**

5.      The Plaintiff, John M. McClellan, is a resident of Blountstown, Florida. McClellan was a holder of Regions stock at the time of the merger, and he has been damaged by the defendants' conduct described in this complaint.  But for the false and misleading information contained in the Proxy Statement, McClellan would not have voted in favor of the Acquisition.

*Regions*

6.      Regions Financial Corp. is a Delaware corporation.   Post-Acquisition, the combined entity is a financial holding company which operates throughout the South, Midwest and Texas. Regions provides traditional commercial, retail and mortgage banking services, as well as other financial services in the fields of investment banking, asset management, trust, mutual funds, securities brokerage, insurance and other specialty financing.   On December 31, 2007, Regions reportedly had total consolidated assets of approximately $141.0 billion, total consolidated deposits of approximately $94.8 billion and total consolidated stockholders' equity of approximately $19.8 billion. Regions' principal executive offices are located at 1900 Fifth Avenue North, Birmingham, Alabama.

*The Individual Defendants*

7.      Defendant C. Dowd Ritter has served as Regions' President, CEO and a director since the Acquisition.  Ritter has also served as Regions' Chairman of the Board of Directors since Moore resigned the chairmanship in January 2008.  Before the Acquisition, Ritter had

served as President and CEO of AmSouth and AmSouth Bank and Chairman of the Board of AmSouth Bank since 1996. Ritter had served as chairman of the AmSouth board from September 1996 to October 1999 and from January 2001 through the Acquisition. Defendant Ritter signed the false and misleading April 2008 Prospectus, the Proxy Statement, the FY 2006 and 2007 annual financial reports, all 2007 and 2008 interim financial reports and the Sarbanes-Oxley certifications that accompanied those financial statements.

8.      Defendant Jackson W. Moore served as Regions' Executive Chairman of the Board from January 2007 to December 2007; Chairman of the Board from May 2006 to January 2007; CEO from July 2005 to November 2006; CEO Designate from July 2004 to July 2005; and President from July 2004 to November 2006. Moore also served as a Regions director from 1986 to December 2007. Defendant Moore signed the false and misleading the Proxy Statement and the FY 2006 annual financial report.

9.      Defendant Irene Esteves is, and has been since April 1, 2008, the Chief Financial Office ("CFO") of Regions. Esteves signed the false and misleading 2008 interim financial reports for the first three quarters of 2008 and the Sarbanes-Oxley certifications that accompanied those financial reports.

10.     Defendant Alton E. Yother was CFO of Regions from April 13, 2007 until April 1, 2008. Yother signed the false and misleading 2007 annual financial report, all interim financial reports for the first three quarters of 2007, and the Sarbanes-Oxley certifications that accompanied them.

11.     Defendant Bryan Jordan was CFO of Regions from December 19, 2002 until April 1, 2007.  Jordan signed the false and misleading Proxy Statement, the 2006 annual financial report, and the Sarbanes-Oxley certification that accompanied that report.

12.     Defendant Ronald C. Jackson was Regions' Comptroller from 2003 to at least January 2007; Senior Vice President from 1998 to at least January 2007; Director of Investor Relations from 1995 to at least April 2002; Assistant Comptroller in 1996; and an Analyst in 1994. Jackson signed the false and misleading Proxy Statement.

13.     Defendant Richard D. Horsley was Regions' Vice Chairman of the Board from 1982 to November 2006; Head of Transactions & Integration from November 2006 to December 2006; CEO, Business Enterprises from July 2005 to at least April 2006; Chief Operating Officer from December 2002 to July 2005; and Executive Financial Officer from 1982 to December 2002. Horsley was also a Regions director from 1982 to November 2006. Horsley signed the false and misleading Proxy Statement.

14.     Defendant Allen B. Morgan, Jr. is Regions' Chairman Emeritus and has been since December 2007. Morgan is also a director of various Regions-Morgan Keegan ("RMK") Strategic Income funds and has been since 2003. Morgan was Morgan Keegan's Chairman of the Board from 1969 to December 2007 and CEO from 1969 to 2003. Morgan was also Regions' Vice Chairman of the Board from 2003 to December 2007 and a director from 2001 to December 2007. Morgan signed the false and misleading Proxy Statement and 2006 annual financial report.

15.     Defendant Samuel W. Bartholomew Jr. has served as a director of Regions (or Union Planters, before it was acquired by Regions) since 2001. Bartholomew is also a member of Regions' Risk Committee and has been since 2007. Bartholomew signed the false and misleading Proxy Statement.

16.     Defendant George W. Bryan has served as a director of Regions (or Union Planters) since 1986.  Bryan is also a member of Regions' Compensation Committee and has

been since at least 2006.  Bryan allowed his name to be use in solicitation of proxies through the false and misleading Proxy Statement.

17.     Defendant Margaret H. Greene served as a Regions director from 2002 to November 2006. Greene was also a member of Regions' Risk Committee in 2006.   Greene signed the false and misleading Proxy Statement.

18.     Defendant Susan W. Matlock has served as a Regions director since 2002. Matlock is also a member of Regions' Compensation Committee and has been since at least 2006. Matlock signed the false and misleading Proxy Statement.

19.     Defendant Jorge M. Perez served as a Regions director from 2001 through 2008. Perez was also a member of Regions' Risk Committee in 2006.   Perez signed the false and misleading Proxy Statement.

20.     Defendant Dr. Malcolm Portera served as a Regions director from 2003 until at least 2007.  Portera signed the false and misleading Proxy Statement.

21.     Defendant John R. Roberts has served as a Regions director since 2001. Roberts is also a member of Regions' Audit Committee and has been since at least 2006 and was a member of Regions' Risk Committee in 2006. Roberts signed the false and misleading Proxy Statement.

22.     Defendant Michael S. Starnes served as a Regions director from 2001 to November 2006. Starnes was also a member of Regions' Compensation Committee in 2006. Starnes allowed his name to be use in solicitation of proxies through the false and misleading Proxy Statement.

23.     Defendant Lee J. Styslinger III has served as a Regions director since 2003. Styslinger is also a member of Regions' Audit Committee and has been since at least 2006. Styslinger signed the false and misleading Proxy Statement.

24.     Defendant Robert R. Waller was a Regions director from 2001 to April 2007. Waller signed the false and misleading Proxy Statement.

25.     Defendant Spence L. Wilson served as a Regions director from 1996 to 2008. Wilson had also served as a member of Regions' Risk Committee and has been since at least 2006 and was Chairman of Regions' Risk Committee in 2006. Wilson signed the false and misleading Proxy Statement.

26.     Defendant Harry W. Witt served as a Regions director from 2002 to April 2008. Witt was member of Regions' Audit Committee from at least 2006 to 2007. Wilson signed the false and misleading Proxy Statement.

27.     Collectively, Defendants Ritter, Moore, Esteves, Yother, Jordan, Jackson, Horsley, Morgan, Bartholomew, Bryan, Greene, Matlock, Perez, Portera, Roberts, Starnes, Styslinger, Waller, Wilson, and Witt are referred to as the "Individual Defendants."

***Merrill Lynch, Price, Fenner & Smith, Inc.***

28.     Defendant Merrill Lynch is an investment banking firm headquartered in New York, New York. Merrill Lynch was acquired by Bank of America in June 2008.  Merrill Lynch acted as financial advisor to Regions in connection with the Acquisition.  Merrill Lynch not only acted as advisor to Regions in connection with this transaction, but also rendered a false opinion contained in the Proxy Statement that the consideration to Regions was fair.  In return for its participation in the scheme, including knowingly rendering its false and misleading fairness

opinion and for participating in writing the false and misleading Proxy Statement, Merrill Lynch received a substantial fee.

29.     Merrill Lynch was motivated to enhance its business prospects and interests by concealing the truth about the Company's financial condition.  AmSouth was a rapidly-growing, major participant in the burgeoning Florida real estate finance business. Merrill Lynch was hired by the Individual Defendants to render a fairness opinion with respect to the AmSouth Acquisition.  Merrill Lynch was motivated to maintain its employment and good relations with Moore, Ritter and the other Individual Defendants in order ensure it would continue getting the combined Regions/AmSouth investment banking work and so that it could maintain its relationship with Morgan Keegan, with whom it served as co-lead managing underwriters in various financial transactions.

30.     Merrill Lynch issued an opinion included in the August 2006 Proxy Statement to the effect that the transaction described therein was fair and the consideration to be paid by Regions for AmSouth was adequate. Merrill Lynch knew of, or was recklessly indifferent to, the true value of AmSouth prior to the preparation of the Proxy Statement, including the fact that AmSouth's Florida loan portfolio was grossly overvalued, and knew or was reckless in not knowing that the opinion it rendered was false and misleading.

*Ernst &Young, LLP*

31.     Defendant Ernst & Young LLP ("E&Y") served as outside auditor to both Regions and AmSouth; E&Y also provided accounting services for Regions and AmSouth before, in connection with, and after the Acquisition, which included "clean" or "unqualified" opinions on Regions' and AmSouth's 2005, 2006 and 2007 annual audited financial statements. E&Y also reviewed and approved the unaudited financial statements of Regions and AmSouth

issued in connection with the April 2008 Offering and the Acquisition. In the Proxy Statement, E&Y expressly consented to: (i) its inclusion as an "Expert"; (ii) the incorporation by reference of its reports of March 3, 2006 with respect to the consolidated financial statements of Regions and AmSouth and their management's assessment of the effectiveness of their internal control over financial reporting and the effectiveness of their internal controls over financial reporting; (iii) the incorporation by reference of Regions' and AmSouth's FY 2005 reports on Form 10-K; and (iv) the incorporation by reference of E&Y reports dated May 5, 2006 and August 4, 2006, relating to the unaudited consolidated interim financial statements of AmSouth that were included in its Forms 10-Q for the quarters ended March 31, 2006 and June 30, 2006. E&Y was not independent with respect to the Acquisition, as it was the auditor for both Regions and AmSouth and had been promised it would be the auditor/accountant for the gigantic new Company—Regions—after the Acquisition and thus would garner huge amounts of accounting, auditing and consulting fees post-merger for years to come.

32.    This was critical as Regions was the E&Y's Birmingham office's biggest pre-Acquisition customer, with Regions paying E&Y $4.7 million, $5.5 million and $3.8 million for audit, tax and other services in FY 2005,2004 and 2003, respectively.  AmSouth was one of its next largest accounts, paying E&Y $2.4 million, $2.4 million and $1.5 million for audit, tax and other services in 2005, 2004 and 2003, respectively.  Retaining Regions as a client post-Acquisition was critical as E&Y-Birmingham had lost its previous largest audit account—HealthSouth—when that company imploded in its own financial fraud in 2003.

33.    E&Y consented to the use of its prior unqualified audit opinions of AmSouth in the Proxy Statement.  E&Y also issued unqualified audit opinions throughout the relevant period, certifying that Regions' post-Acquisition financial statements were prepared in accordance with

Generally Accepted Accounting Principles ("GAAP") for fiscal 2006 and 2007, and the first three interim financial periods for FY 2008, and that E&Y's audits of such financial statements had been performed in accordance with Generally Accepted Auditing Standards ("OAAS"), knowing they had not.  As a result, E&Y knew, or recklessly disregarded, that the value of the goodwill being reported in connection with the Acquisition and throughout the relevant period was materially overstated. In addition, E&Y knew, or recklessly disregarded, that its audits were not performed in accordance with GAAS.

34.    E&Y knew of, or was recklessly indifferent to, the true value of the goodwill being attributed to AmSouth in the Proxy Statement and in Regions' post-Acquisition financial reports was materially inflated, including the fact that AmSouth's Florida loan portfolio was grossly overvalued. Nonetheless, E&Y consented to the incorporation of AmSouth's FY 2005 audited financial report in the Proxy Statement and continued issuing unqualified audit opinions for Regions' financial statements that continued including the inflated goodwill throughout the relevant period.

## JURISDICTION AND VENUE

35.    The claims asserted in this complaint arise under sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. sections 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC.  17 C.F.R. § 14a-9.

36.    This Court has jurisdiction over the subject matter of this case under 28 U.S.C. sections 1331 and 1337, as well as section 27 of the Exchange Act.  15 U.S.C. § 78aa.

37.    Venue is proper in this district under section 27 of the Exchange Act, as well.  15 U.S.C. § 78aa.  Both Regions and AmSouth were headquartered in Birmingham, Alabama,

before the Acquisition and, after the Acquisition, "new Regions" has maintained its headquarters in this district.

38.     Plaintiff further believes that many of the misleading statements communicated to him and other members of the Class originated here.

39.     In connection with the acts alleged in this complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who held common stock of Regions on either August 14, 2006 (the record date), or at any time from October 3, 2006 (the proxy date) through November 4, 2006 (the merger date). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

41.     The members of the Class are numerous, and joinder of all class members is impracticable.   Regions has more than 1.19 billion shares of stock outstanding, and those numerous shares likely are owned by hundreds of thousands of investors.

42.     This case presents common questions of both fact and law that would be most efficiently resolved through a certified class action.   Among those common questions are the following:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Individual Defendants are liable for their conduct as control persons under section 20 of the Exchange Act;

(c)     whether the Proxy Statement disseminated by defendants to the investing public in connection with the merger misrepresented and/or omitted material facts about the merger negotiations;

(d)     whether defendants participated in and pursued the improper course of conduct complained of herein; and

(e)    to what extent the members of the Class sustained damages and the proper measure of damages.

43.    Plaintiff's claims are typical of the claims of other Class members, because all members of the Class are similarly affected by defendants' wrongful conduct in violation of Federal law as described in this complaint.

44.    Plaintiff will fairly and adequately protect the interest of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

45.    A class action is superior to all other available methods of litigation for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

46.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR

47.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to existing facts and conditions.    In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not sufficiently identified as "forward-looking statements" when made, and there was no statement made with respect to any of those representations forming the basis of this complaint that actual results could differ materially from those in the purportedly forward-looking statements.

## SUBSTANTIVE FACTUAL ALLEGATIONS

48.    In May 2006, AmSouth and Regions announced plans to "merge."   The transaction was cast by both banks as "a merger of equals," but, as the *St. Petersburg Times* stated in a May 26, 2006, story, "observers said Regions clearly has the upper hand."   The truth of the situation was that Regions, a regional bank that was headquartered across the street from AmSouth in Birmingham, Alabama, would acquire the overvalued assets of AmSouth.

49.    In fact, the Proxy Statement filed with the SEC and sent to shareholders of both Regions and AmSouth advised that the transaction was in reality an "acquisition" of AmSouth by Regions and that the balance of the purchase price that could not be directly attributed to a tangible asset—an astounding $6 billion of the approximately $10 billion being paid would be recorded as "goodwill," or "excess purchase price," on new Regions' balance sheets following the Acquisition:

> Accounting Treatment
>
> The merger will be accounted for as a "purchase" by Regions of AmSouth, as that term is used under U.S. Generally Accepted Accounting Principles, which we refer to as GAAP, for accounting and financial reporting purposes. As a result, the historical financial statements of Regions will continue to be the historical financial statements of Regions following the completion of the merger. ***The assets (including identifiable intangible assets)*** *and liabilities (including executory contracts and other commitments)* ***of AmSouth as of the effective time of the merger will be recorded at their respective fair values and added to those of Regions. Any excess of purchase price over the net fair values of AmSouth assets and liabilities is recorded as goodwill (excess purchase price).***

50.    Under the terms of the Acquisition, each share of AmSouth would be exchanged for 0.7974 share of Regions common stock. Based on the closing prices of Regions' and AmSouth's stock, the Companies estimated the market capitalization of the combined entity

would be approximately $26 billion. The deal valued AmSouth shares at $28.33 each, putting the overall value of the deal at approximately $10 billion.

51.     There were two main assets that AmSouth brought to the table: the approximately $6 billion in goodwill it was valued to have at the time of the merger and its prospects to double operations in the Florida real estate market.  As would later be disclosed, those two positives were actually serious negative assets that would cost Regions significant amounts of value.

**AmSouth's Overvalued Goodwill**

52.     As approximately 60% of the book value of AmSouth to Regions shareholders, the goodwill that AmSouth had accrued was an essential element of the Acquisition.  The value of that asset in reality, however, was much lower than the books made it seem.

53.     In October 2004, the U.S. Attorney for the Southern District of Mississippi and the Internal Revenue Service jointly announced that AmSouth Bancorporation and AmSouth Bank had entered into a deferred prosecution agreement.

54.     That deferred prosecution agreement detailed conduct by two men, Victor Nance and Louis Hamric, who ran a Ponzi scheme through AmSouth.  The government also detailed the manner in which the fraudulent Ponzi scheme relied on the loose controls that AmSouth applied to its custodial accounts, and the fact that AmSouth's lax controls allowed Nance and Hamric to defraud nearly 60 investors of their life savings.

55.     In connection with that course of wrongful conduct, AmSouth agreed to forfeit approximately $40 million to the government.  According to the October 12, 2004 release from the office of the U.S. Attorney for the Southern District of Mississippi: "This is one of the largest forfeitures ever by a publicly traded bank."

56.     To make matters worse, AmSouth was penalized because it did not cooperate fully with the investigation conducted by the Government.   AmSouth's in-house counsel assigned to respond to these subpoenas failed to produce from his own files documents which the government said "were clearly responsive to the subpoenas."   The government also charged that AmSouth's in-house counsel was also aware or should have been aware of other AmSouth employees who had responsive documents, and he failed to gather and produce those documents as well.   AmSouth refused to produce any of those documents until it became the target of the criminal investigation itself.

57.     As one would anticipate from such serious criminal conduct, the public relations hit AmSouth took was both substantial and lingering.   It acknowledged as much in its annual report, which as filed in early 2005:

> In October 2004, AmSouth entered into a deferred prosecution agreement with the U.S. Attorney for the Southern District of Mississippi relating to deficiencies in the Bank's reporting of suspicious activities under the Bank Secrecy Act. At the same time, AmSouth entered into a cease and desist order with the Federal Reserve and the Alabama Department of Banking, as well as an order with the Financial Crimes Enforcement Network, relating to AmSouth's deficiencies in compliance with the Bank Secrecy Act. Provided that AmSouth complies with the obligations under the deferred prosecution agreement for a period of twelve months, the U.S. Attorney has agreed not to take further action against the Company in connection with this matter. The Federal Reserve has also indicated it will restrict the Company's expansion activities, including the branch expansion program, until such time as it believes that AmSouth is in substantial compliance with the requirements of the cease and desist order. Pursuant to these agreements, AmSouth has taken additional actions to ensure compliance with the Bank Secrecy Act Among other things, these actions include independent third party reviews of all of the Company's activities related to compliance with the Bank Secrecy Act….
>
> ***
>
> It may take a number of years to fully and finally resolve the legal proceedings, including actions, claims and disagreements with regu1lltors and law enforcement agencies, currently pending due to their complexity and for other reasons. Further, in view of the inherent difficulty of predicting the outcome of such proceedings, AmSouth cannot state what the eventual outcome of these proceedings will be….

*AmSouth's Overvalued Florida Presence*

58.     Intertwined with the goodwill attributable to AmSouth was its rapidly expanding presence in Florida real estate during the period immediately before and after the Acquisition.

59.     The value the market attributed to AmSouth's real estate lending business in August 2006, and thus to its stock price, was materially overstated.   As real estate prices escalated in 2004—especially in hot markets like Florida—AmSouth had taken imprudent steps to guard against any "bubble" aspect of Florida real estate.   AmSouth, rather than hedging against the potential for that bubble to burst, aimed to "double Florida's contribution" to its income.   Moreover, according to its 2005 annual report, which was incorporated by reference into the Proxy Statement, AmSouth said it had "experienced a shift in customer preference toward variable-rate products" and decided "to retain a greater proportion of adjustable-rate residential mortgages on the balance sheet."

60.     To fund the increased adjustable-rate lending, AmSouth sold its $550 million credit card portfolio in the fourth quarter of 2004. As a result of these changes, according to AmSouth's FY 2005 financial report, during FY 2005 AmSouth's "commercial loans secured by real estate increased $455.3 million or 20 percent due to increased construction activity and further penetration into AmSouth's Florida markets."

61.     Nonetheless, the MD&A section in AmSouth's 2005 annual report indicated that AmSouth had lowered its "loan and lease loss provision [for FY 2005], primarily due to improved credit quality," resulting in "increased earnings in 2005."   AmSouth also claimed that "[c]redit quality showed further improvement during 2005 as evidenced by the reduction in net charge-offs," that the "improvement in credit performance reflects . . . the benefit of tighter underwriting of home equity and indirect loans," that "[e]fforts associated with AmSouth's

strategic initiative to grow Commercial Banking with improved credit quality were the primary driver of commercial and commercial real estate loan growth," and that the "credit quality of home equity originations during 2005 remained high." Finally, the MD&A to the FY 2005 annual report expressly stated that "regular reports [were] made to Senior Management, the Board of Directors and the Risk Committee of the Board regarding the credit quality of the loan portfolio as well as trends in the portfolio."

62.     The 2005 annual report from AmSouth did not disclose, however, was that AmSouth, which had little experience servicing large loan portfolios, much less large portfolios of adjustable-rate mortgages, had significantly lowered it underwriting standards in its quest to dramatically increase its presence in Florida's booming real estate market.   Despite strong market indicators that history and logic informed AmSouth that the Florida real estate market was overbuilt and over-heated, AmSouth ran headlong into a bursting bubble.

***False and Misleading Statements Made in the Proxy Statement***

63.     In connection with the Acquisition, the Individual Defendants and Merrill Lynch, for the purpose and with the effect of accomplishing the AmSouth Acquisition, disseminated to shareholders and filed with the SEC a Proxy Statement that falsely reported the value being attributed to AmSouth in the Acquisition, the fairness of the exchange ratio of shares being paid to acquire AmSouth in the Acquisition, and the combined entity's pro forma balance sheet and income statement.  The Proxy Statements also referred to the goodwill (excess purchase price) the combined entity would recognize post-Acquisition without stating the extent to which it would be immediately impaired upon completion of the Acquisition.

64.     Specifically, as to AmSouth's pre-Acquisition Asset Quality Ratios, the Proxy Statement represented that:

|  | At or for the Six Months Ended June 30, | |
|  | 2006 | 2005 |
| --- | --- | --- |
| **Asset Quality Ratios:** | | |
| Allowance for loan and lease losses to loans, net of unearned income | 0.96% | 1.09% |
| Allowance for loan and lease losses to non-performing loans(2) | 378 | 519 |

65.     Statements concerning AmSouth's pre-Acquisition Asset Quality Ratios were false and misleading, because they concealed that AmSouth's loan/lease loss provisions were materially understated.   That understatement was a result of AmSouth's inexperience lending and servicing its rapidly expanding portfolio of adjustable interest rate loans, in Florida and elsewhere, and its failure to take appropriate loan loss reserves based on reasonable expected losses in its loan portfolio.

66.     Concerning the pro forma consolidated balance sheet of the combined entity as of June 30, 2006, the Proxy Statement stated:

|  | As of June 30, 2006 |
|  | (In thousands) |
| --- | --- |
| **Selected Statement of Financial Condition Data:** | |
| Total assets | $   142,437,065 |
| Securities available for sale | 16,908,586 |
| Securities held to maturity | 5,208,166 |
| Loans, net of unearned income | 93,002,169 |
| Deposits | 96,237,635 |
| Borrowed funds | 23,062,405 |
| Stockholders' equity | 20,443,785 |

67.     Statements concerning the combined entity's pro forma balance sheet as of June 30, 2006 were false and misleading, because they concealed that AmSouth's loan/lease loss provisions were materially understated as a result of AmSouth's lack of experience lending and

servicing the portfolio of adjustable interest rate loans and failure to take appropriate loan loss reserves based on the actual expected losses in its loan portfolio, resulting in a material overstatement of the pro forma value of the combined entity's assets, loans and shareholder equity.

68.   The Proxy Statement contained the following information regarding the combined entity's pro forma income statement as of June 30, 2006:

| For the Six Months | For the Twelve Months | |
| | Ended<br>June 30, 2006 | Ended<br>December 31, 2005 |
| | (In thousands, except per share data) | |
| **Selected Statements of Income Data:** | | |
| Interest income | $ 3,883,608 | $   6,765,262 |
| Interest expense | 1,637,099 | 2,504,339 |
| Net interest income | 2,246,509 | 4,260,923 |
| Provision for loan losses | 108,800 | 258,950 |
| Net interest income after provision for loan losses | 2,137,709 | 4,001,973 |
| Non-interest income | 1,411,892 | 2,728,612 |
| Non-interest expense | 2,234,939 | 4,499,624 |
| Income before income taxes | 1,314,662 | 2,230,961 |
| Income tax expense | 397,113 | 657,055 |
| Net income | $   917,549 | $   1,573,906 |

69.   Statements concerning the combined entity's pro forma income statements as of June 30, 2006 were false and misleading in that AmSouth's loan loss provisions were overstated, resulting in an overstatement of the pro forma interest income and the net income.

70.   The Proxy Statement contained the following information regarding the combined entity's pro forma Asset Quality Ratios:

| For the Six Months | For the | |
|---|---|---|
| | Ended June 30, 2006 (Annualized) | Twelve Months Ended December 31, 2005 |
| **Selected Financial Ratios (1):** | | |
| Return on average assets(2) | 1.28% | 1.12% |
| Return on average stockholders' equity(3) | 9.00% | 7.73% |
| Return on average tangible stockholders' equity(4) | 21.27% | 18.17% |
| Ending stockholders' equity to total assets | 14.35% | N/A |
| Ending tangible stockholders' equity to total tangible assets | 5.79% | N/A |
| Efficiency ratio(5) | 61.10% | 64.25% |

71.     Statements concerning the combined entity's pro forma balance sheet were false and misleading in that they concealed that AmSouth' s loan/lease loss provisions were materially understated due to AmSouth's lack of experience lending and servicing the portfolio of adjustable interest rate loans and failure to take appropriate loan loss reserves based on the reasonable expected losses in its loan portfolio, resulting in a material overstatement of the value of the combined entity's pro forma assets, loans and shareholder equity.

72.     The Proxy Statement "incorporated by reference" "AmSouth 's Annual Report on Form 10-K for the year ended December 31, 2005, and Quarterly Report on Form 10-Q as of June 30, 2006." AmSouth's 2005 Form 10-K and Quarterly Reports on Form 10-Q as of June 30, 2006 were false and misleading, because they concealed that AmSouth's loan/lease loss provisions were materially understated as a result of AmSouth's lack of experience lending and servicing the growing portfolio of adjustable interest rate loans and failure to take appropriate loan loss reserves based on the reasonable expected losses in its loan portfolio.

73.     Concerning the "Opinion of Regions' Financial Advisor," the Proxy Statement falsely stated that: (i) Merrill Lynch had "made its determination as to fairness on the basis of experience and professional judgment after considering the results of all its analyses"; (ii) that "[w]ith respect to the financial forecast information and the expected synergies furnished to or discussed with Merrill Lynch by AmSouth or Regions, Merrill Lynch assumed that they had

been reasonably prepared and reflected the best currently available estimates and judgment of the management of AmSouth or Regions as to the expected future financial performance of AmSouth or Regions, as the case may be, and the expected synergies"; (iii) concerning its completion of a discounted dividend analysis as to the value of AmSouth pre-Acquisition and the combined entity pro forma, the Proxy Statement stated that Merrill Lynch used discount rates ranging from 11.0% to 13.0%, rates Merrill Lynch viewed as the appropriate range for companies with AmSouth's risk characteristics; and (iv) that "[i]n conducting its analyses and arriving at its opinions, Merrill Lynch utilized a variety of generally accepted valuation methods" in "providing] its opinion to the Regions board of directors as to the fairness, from a financial point view, to Regions of the exchange ratio pursuant to the merger agreement."

74.     The statements concerning Merrill Lynch's fairness opinion were false and misleading as: (i) the rushed due diligence provided would had not permitted Merrill Lynch to apply its "experience, "to exercise its "professional judgment, "or to "consider . . . the results of all of its analyses" before rendering its fairness opinion - instead, the "fairness" had been a foregone conclusion and Merrill Lynch was merely selling its stamp of approval; (ii) Merrill Lynch knew the "financial forecast information and the expected synergies furnished to or discussed with" it did not "reflect ... the best currently available estimates and judgment of the management of AmSouth or Regions as to the expected future financial performance of AmSouth or Regions" or the "expected synergies"; (iii) discount rates ranging from 11.0% to 13.0% were not "the appropriate range/or companies with AmSouth's risk characteristics"; and (iv) Merrill Lynch had not "utilized . . . generally accepted valuation methods" in "provid[ing] its opinion to the Regions board of directors as to the fairness, from a financial point view, to Regions of the exchange ratio pursuant to the merger agreement."

75.     Concerning the "Accounting Treatment" of the Acquisition, the Proxy Statement stated that the "assets (including identifiable intangible assets) and liabilities . . . of AmSouth as of the effective time of the merger w[ould] be recorded at their respective fair values and added to those of Regions" that "[a ]ny excess of purchase price over the net fair values of AmSouth assets and liabilities [would be] recorded as goodwill (excess purchase price)," and that "[f]inancial statements of Regions issued after the merger [would] reflect such fair values ...." These statements were false and misleading as AmSouth's loan loss provisions were materially understated, resulting in an overstatement of the value of its assets as of the time of the Acquisition. Moreover, due to the drive to "double" AmSouth's exposure to the Florida real estate market since 2004 and its failure to record proper loan loss reserves, the goodwill being attributed to the AmSouth acquisition would immediately be impaired upon completion of the Acquisition.

***Regions, AmSouth, and Defendants' Push toward the Acquisition***

76.     As disclosed in the proxy statement, the Acquisition of AmSouth began with social discussions between Moore and Ritter.  The following excerpt from the Proxy Statement contains the narrative of the deal—the best face possible—for the Acquisition.  Even under that rosy picture, only a few days' due diligence were allowed before the respective boards of directors unanimously approved the Acquisition:

> Jackson W. Moore, Chairman, President and Chief Executive Officer of Regions, and C. Dowd Ritter, Chairman, President and Chief Executive Officer of AmSouth, have known each other for several years, and periodically have spoken about their respective companies and the banking industry at industry meetings. In late 2005, Mr. Moore and Mr. Ritter met in a social setting and during the course of conversation discussed general industry trends and developments regarding their respective companies.
>
> In January 2006, the Regions board of directors held a regular meeting at which they discussed generally strategic objectives and the financial services industry, and during the course of this strategic review, the Regions board of directors

discussed AmSouth and the preliminary conversation between Mr. Moore and Mr. Ritter. At this meeting, the board authorized Mr. Moore to engage in exploratory discussions with Mr. Ritter regarding a possible strategic transaction between the two companies. Subsequent to this meeting, starting in February 2006, Mr. Moore and Mr. Ritter spoke regarding the possibility of a strategic merger of the two companies.

Based on preliminary mutual interest in the potential merits of a possible strategic transaction, exploratory discussions between the two companies concerning the framework for a possible transaction that would be mutually acceptable followed starting in mid-March 2006. These discussions focused on a strategic at-market merger, with fairly apportioned board and management representation and participation in the combined company and a "best-of-breed" approach to key management positions, as likely the most promising strategic direction for each company. Mr. Moore periodically apprised members of the Regions board of directors of the status of his discussions with Mr. Ritter. At a regular meeting of the Regions board of directors held in April 2006, Mr. Moore described to the Regions board of directors his preliminary discussions with Mr. Ritter regarding a combination of Regions and AmSouth. The Regions board of directors recommended that Mr. Moore continue to pursue his discussions with Mr. Ritter. Thereafter, at a regular meeting of the Regions board of directors held in May 2006, Mr. Moore updated the board on the status of the preliminary discussions, and there was a consensus among the Regions directors that pursuing a transaction along the lines that had been outlined would be an attractive strategic and financial transaction for Regions to pursue. During the same period, Mr. Ritter periodically apprised members of the AmSouth board of directors of the status of his discussions with Mr. Moore. At a regularly scheduled AmSouth board of directors meeting held in April 2006, Mr. Ritter described to the AmSouth board of directors his preliminary discussions with Mr. Moore regarding a combination of AmSouth and Regions. The AmSouth board of directors recommended that Mr. Ritter continue to pursue his conversations with Mr. Moore and believed that a merger generally along these lines represented a potentially unique strategic and financial opportunity. In connection with these discussions, AmSouth retained Goldman Sachs as its outside financial advisor and Sullivan & Cromwell LLP as its outside legal advisor, and Regions retained Merrill Lynch as its outside financial advisor and Wachtell, Lipton, Rosen & Katz as its outside legal advisor.

***On May 17, 2006, the parties entered into a confidentiality agreement, and thereafter commenced mutual due diligence.***

At about that time, the parties and their outside counsel also began preliminary drafting of the transaction documents. Discussions between representatives of Regions and AmSouth continued regarding a potential business combination and the benefits for each company that could result from such a transaction. As a result of these discussions, the parties agreed to recommend to their respective boards of directors an all-stock transaction in which AmSouth would merge into

Regions, with Regions being the surviving corporation, and having a fixed exchange ratio of 0.7974 shares of Regions common stock for each share of AmSouth common stock, which was designed to produce an at-market exchange ratio based on the ratio of the closing market price of AmSouth common stock on May 22, 2006 to the closing market price of Regions common stock on May 22, 2006. The parties and their respective counsel also negotiated the other terms of the definitive transaction agreements and exchanged disclosure schedules.

On May 24, 2006, the board of directors of Regions met with senior management and their outside legal and financial advisors. Management reviewed for the Regions board of directors the background of discussions with AmSouth and the progress of negotiations, and reported on Regions' due diligence investigations of AmSouth. Merrill Lynch reviewed with the Regions board of directors the structure and other terms of the proposed transaction, and financial information regarding AmSouth, Regions and the transaction, as well as information regarding peer companies and comparable transactions. In connection with the deliberation by the Regions board of directors, Merrill Lynch rendered to the Regions board of directors its oral opinion (subsequently confirmed in writing), as described under "Opinion of Regions' Financial Advisor", that, as of the date of its opinion, and subject to and based on the qualifications, limitations and assumptions set forth in its written opinion, the exchange ratio in the merger was fair, from a financial point of view, to Regions.

* * * * * *

AmSouth's board of directors met in the afternoon of May 24, 2006. Mr. Ritter and other senior AmSouth executives reviewed the status of discussions and negotiations with Regions since the previous board meeting. Members of AmSouth's management discussed the due diligence process and findings and financial aspects of the transaction, including the proposed merger consideration, accretion/dilution analysis, post-merger capital ratios, dividend rates, estimated expense savings and revenue opportunities. Management also discussed strategic factors related to the proposed transaction. Representatives from Goldman Sachs delivered a financial analysis of the transaction and then advised the AmSouth board of directors of its opinion that, as of May 24, 2006, and based upon the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Goldman Sachs, all as set forth in its written opinion, the exchange ratio pursuant to the merger agreement was fair, from a financial point of view, to holders of AmSouth common stock.

77.     Both AmSouth and Regions sent materially-identical statements to their investors

promoting the Acquisition:

NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

TO BE HELD ON OCTOBER 3, 2006

Regions Financial Corporation will hold a special meeting of Regions stockholders at Regions Bank Operations Center, 201 Milan Parkway, Birmingham, Alabama, 35209, at 10:00 a.m. local time, on October 3, 2006 to consider and vote upon the following matters:

• a proposal to adopt the Agreement and Plan of Merger, by and between Regions Financial Corporation and AmSouth Bancorporation, dated as of May 24, 2006, as it may be amended from time to time, pursuant to which AmSouth Bancorporation will be merged with and into Regions Financial Corporation;

• a proposal to approve the adjournment of the Regions special meeting, if necessary or appropriate, to solicit additional proxies; and

• such other business as may properly come before the special meeting of stockholders or any adjournment or postponement of the meeting.

Upon completion of the merger, Regions will be the surviving corporation, and each share of AmSouth common stock will be converted into 0.7974 shares of Regions common stock. Your attention is directed to the joint proxy statement/prospectus accompanying this notice for a complete discussion of the merger. A copy of the merger agreement is included as Annex A to the accompanying joint proxy statement/prospectus.

The board of directors has fixed the close of business on August 14, 2006 as the record date for the Regions special meeting. Regions stockholders of record at such time are entitled to notice of, and to vote at, the Regions special meeting or any adjournment or postponement of the special meeting.

***Whether or not you plan to attend the special meeting, please submit your proxy with voting instructions. To submit your proxy by mail, please complete, sign, date and return the accompanying proxy card in the enclosed self-addressed, stamped envelope.*** Alternatively, you may use the toll-free telephone number indicated on the proxy card to vote by telephone or visit the website indicated on the proxy card to vote on the internet. This will not prevent you from voting in person, but it will help to secure a quorum and avoid added solicitation costs. Any holder of Regions common stock who is present at the Regions special meeting may vote in person instead of by proxy, thereby canceling any previous proxy. Also, a proxy may be revoked in writing at any time before the Regions special meeting.

***The Regions board of directors has unanimously approved the merger agreement and unanimously recommends that Regions stockholders vote "for" adoption of the merger agreement.***

78.     In the Q&A portion of the Proxy Statement, the question "Why is my vote important?" was asked, and answered as follows:  "The affirmative vote of the holders of at least

a majority of the outstanding shares of each of Regions and AmSouth is required to adopt the merger agreement. Accordingly, if a Regions stockholder or an AmSouth stockholder fails to vote or abstains, this will have the same effect as a vote against adoption of the merger agreement." The proxies, therefore, were integral to the accomplishment of the Acquisition.

79.     The joint letter from Ritter and Moore also stated as follows: "*We cannot complete the merger unless Regions stockholders and AmSouth stockholders adopt the merger agreement. Regions and AmSouth will each hold a stockholders' meeting to vote on this merger proposal. Your vote is important.*"

80.     Based on the materially false and misleading statements in the Proxy Statement, the vote in favor of the Acquisition was successful. In a Form 8-K filed on October 3, 2006, the following information was given to the SEC by the Company: "On October 3, 2006, the stockholders of Regions approved the proposed merger of AmSouth with and into Regions. Approximately 96% of the shares represented in person or by proxy at the meeting voted in favor of the merger. Approximately 70% of all outstanding shares were represented at the meeting." The Acquisition could not have been accomplished absent the votes secured through the information contained in the Proxy Statement.

81.     On November 4, 2006 the Individual Defendants issued a release entitled "Regions and AmSouth Complete Merger," which stated in relevant part that:

> "This creates a top 10 U.S. bank holding company with leading positions in some of the fastest growing markets in the United States and an even broader range of products, services and locations for our 5 million customer households," said Jackson W. Moore, chairman of Regions' Board of Directors.

> "With the combination of these two great companies we have redoubled our commitment to providing great service to our customers and forming strong relationships with our communities," said Dowd Ritter, president and chief executive officer of Regions and the former chairman, president and chief executive officer of AmSouth.

The actual results of the Acquisition, however, were far less rosy and have resulted in substantial losses to the Plaintiff and the Class.

***The Post-Acquisition "Brain Drain"***

82.     As opposed to the "merger of equals" that was touted, Regions' Acquisition of AmSouth led to a dramatic shift in the power structure of the Company.  Regions investors were told that in connection with the Acquisition, Moore would continue on as the combined entity's Chairman and that he had entered into a renewed four-year employment agreement, heavily incentivizing Moore to remain with Regions, and described by the Company as follows:

> On completion of the merger, all equity-based compensation awards will vest and options will remain exercisable in accordance with their terms. Following completion of the merger, Mr. Moore will be paid his accrued SERP benefit, the balance of his deferred stock account and the change-in-control benefits under his existing employment agreement. In addition, Regions will honor the existing terms of the trust agreement pertaining to the payment of premiums on Mr. Moore's life insurance policy. In the event that, during the term, Mr. Moore's employment is terminated by Regions without "cause" or by Mr. Moore for "good reason," Mr. Moore will be paid a lump sum cash payment equal to the sum of (1) a pro rata bonus for the year of termination and (2) Mr. Moore's annual base salary and average annual bonus as Chairman (or if no such bonus has been paid, his last bonus as chief executive officer) for the remainder of the term. In addition, upon such a termination all equity compensation awards will vest and remain exercisable for their full term.

In reality, Moore was gone from Regions within one year, leaving Ritter to assume the reins as Chairman and CEO.

83.     By June 2008, at least seven Regions executives had left to start their own banks, and most of them took former colleagues and longtime Regions customers with them.  This "mass exodus of talent" noted by the banking press further exacerbated the flaws of the Acquisition.  Despite the bursting of the housing bubble and the financial meltdown that followed, a former Regions executive stated that it was a good time to open a bank because the organizers would start with a clean slate: "You're going to beat the heck out of the guy down the

street who has loan problems and can't really do anything - He's boxed himself in and you're going to be able to pick off his customers."

***Post-Acquisition Financial Statements***

84.     On January 19, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports Fourth Quarter 2006 Earnings," which reported 4Q 06 earnings of 56 cents per diluted share, promised "[m]erger integration progressing as planned and on schedule," reported a net interest margin of 4.10% in the 4Q 06, reported "[r]ecord full-year earnings of $151 million at Morgan Keegan," and "[s]trong credit quality." The release also stated in relevant part:

> Newly merged company achieves targeted earnings, merger goals
>
> "Regions reported solid fourth quarter earnings that matched our expectations and we're pleased with the underlying performance of our newly combined company." said Dowd Ritter, president and chief executive officer. "And importantly, our merger integration is on track and meeting or, in some cases, exceeding our goals. This gives us confidence as we enter 2007 to successfully complete the transition to a new, more efficient, and increasingly profitable company."
>
> ***
>
> 4Q and full year 2006 BPS rise 7 and 17 percent versus year-ago periods, respectively, excluding merger-related charges Regions' fourth quarter 2006 net income was $361.6 million, or 56 cents per diluted share, which included $59.3 million in after-tax merger¬ related expenses (9 cents per diluted share). Excluding the impact of merger-related expenses in both years, per share earnings were 65 cents, or 7 percent above year-ago fourth quarter's 61 cents. The fourth quarter was also impacted by an after-tax mortgage servicing rights (MSR) impairment charge of approximately $16.8 million (3 cents per diluted share).
>
> For the full year 2006, Regions earned a record $1.4 billion, or $2.67 per diluted share, including $60.3 million of after-tax merger-related charges (12 cents per diluted share). In 2005, Regions reported net income totaling $1.0 billion, or $2.15 per diluted share, including $110 million (23 cents per diluted share) in after-tax merger-related charges. Excluding merger-related charges, annual per share earnings increased 17 percent to $2.79 from $2.38.

85.     On March 1, 2007, Regions filed its Form 10-K for its fiscal year ending December 31, 2006, the first financial report following the Acquisition which included the AmSouth assets. The Form 10-K falsely stated that Regions' goodwill balance for the fiscal year ending December 31, 2006 was $11.2 billion, reporting that its goodwill was not impaired. Defendants Ritter and Jordan also signed and filed false and misleading Sarbanes-Oxley certifications indicating Regions' annual financial reports did not contain any material misstatements, fairly represented "in all material respects the financial condition [and] results of operations" of Regions and that Regions' internal accounting controls were well designed and effective.

86.     Regions continued to report significant financial growth for the interim quarters during fiscal 2007 and continued reporting that the goodwill attributable to the AmSouth acquisition was not impaired.

87.     On March 1, 2007, the Individual Defendants and E&Y caused Regions to file its false and misleading Fiscal 2006 annual report with the SEC, which included substantially the same financial results previously reported on January 19, 2007. The Form 10-K further reflected Regions' goodwill balance for the fiscal year ending December 31, 2006 as $11.2 billion, reporting that its goodwill was not impaired. Concerning Regions' "Critical Accounting Policies," the 2006 10-K expressly stated that:

> Regions' excess purchase price is tested for impairment annually, or more often if events or circumstances indicate impairment may exist. Adverse changes in the economic environment, declining operations of acquired business units, or other factors could result in a decline in implied fair value of excess purchase price. If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value.

88.     As to Regions' "Allowance for Credit Losses," the 2006 10-K stated that:

The allowance for credit losses represents management's estimate of credit losses inherent in the portfolio as of year-end. The allowance for credit losses consists of two components, the allowance for loan losses and the reserve for unfunded credit commitments. Management's assessment of the adequacy of the allowance for credit losses is based on the combination of both of these components ....

At December 31, 2006, the allowance/or credit losses totaled $1.1 billion or 1.17 percent of total loans, net of unearned income contpll1'ed to $783.5 million or 1.34 percent at year-end 2005. The increase in the allowance is primarily related to the acquisition of AmSouth, which added $335.8 million to the overall allowance. The decrease in the allowance for credit losses to total loans ratio was primarily due to the acquisition of AmSouth, which had a ratio lower than that of Regions. AmSouth's lower allowance for credit loss ratio reflected a product mix higher in residential mortgage secured credits, which inherently have lower loss content . . . . Management expects the allowance for credit loss ratio to vary over time due to changes in economic conditions, loan mix, changes in collateral values or variations in other factors that may affect inherent losses.

Factors considered by management in determining the adequacy of the allowance for credit losses include but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated,¬(3) the level of the allowance for credit losses in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans,- (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments, and (7) management's analysis of economic conditions.

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits.

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on several factors, including current and historical loss experience for each pool and management's judgment of current economic conditions and their expected impact on credit performance.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans which management has identified as impaired, and which are greater than $2.5 million ($1.0 million in 2005), are evaluated individually for purposes of determining appropriate allowances for credit losses . . . . If current valuations are lower than the current

book balance of the credit, the negative differences are reviewed for possible charge- of . . . .

***

Management considers the current level of allowance/or credit losses adequate to absorb probable losses inherent in the loan portfolio and unfunded commitments . . . .

89.     On April 13, 2007, the Individual Defendants caused Regions to announce that CFO Bryan Jordan had resigned and that its controller, Alton Yother, had been named CFO. Yother was AmSouth's CFO at the time of the Acquisition.   This was another example of the "brain drain" at Regions.

90.     On April 17, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports First Quarter 2007 Earnings," reporting 1Q 2007 earnings from continuing operations of 65 cents per diluted share, stating integration was "on track with successful conversions of mortgage and brokerage systems," reporting a net interest margin of 3.99 percent, Morgan Keegan earnings of $45.5 million, and "[l]ow credit losses of an annualized 0.20 percent of average loans. " The release also stated in relevant part that:

> "Our first quarter earnings demonstrate strong core results," said Dowd Ritter, president and chief executive officer. "This quarter was also marked by progress in our merger integration, including successful systems conversions and completion of required branch divestitures. In addition, we completed the sale of EquiFirst, our non-conforming mortgage origination business. This strong start to 2007 is tangible evidence that the many anticipated benefits of the merger are beginning to be realized."

91.     On May 7, 2007, the Individual Defendants and E&Y caused Regions to filed its unaudited interim financial report for the Q1 2007, which included substantially the same financial results previously reported on April 17, 2007. The Form 1O-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2007 as more than $11 billion, reporting that

its goodwill was not impaired. As to Regions' "Allowance for Credit Losses," the Q1 2007 10-Q

stated that:

> The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the portfolio as of March 31, 2007. The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities. The assessment of the adequacy of the allowance is based on the combination of both of these components. Regions determines its allowance in accordance with regulatory guidance, Statement of Financial Accounting Standards No. 114, "Accounting by Creditors for Impairment of a Loan" ("Statement 114") and Statement of Financial Accounting Standards No.5, "Accounting for Contingencies" ("Statement 5").

> At March 31, 2007 and December 31, 2006, the allowance totaled $1.1 billion. The allowance was 1.18% at March 31, 2007 compared to 1.17% at year-end 2006. Net loan losses as a percentage of average loans (annualized) were 0.20% in the first quarter of 2007 compared to 0.27% in the fourth quarter of 2006 ....

> Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans,• (5) collateral values of properties securing loans; (6) the composition 0/ the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their expected impact on credit performance.

> Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits.

> For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans which management has identified as impaired, and which are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances. If current valuations are lower than the current book balance of the credit, the negative differences are reviewed for possible charge-off. In instances where management determines that a charge-off is appropriate, it is taken immediately.

92.     On July 17, 2007, the Individual Defendants caused Regions to issue a release entitled "Regions Reports Second Quarter 2007 Earnings," which reported 2Q 07 earnings from continuing operations of 63 cents per diluted share, the "[s]uccessful conversion of more than 600 branches," stated "Morgan Keegan achieve[d] record earnings of $50.1 million," emphasized that "[c]redit costs remain low with net charge-offs of an annualized 0.23 percent of average loans." The release also stated in relevant part that:

Credit quality remains strong, non-performing loans begin to normalize.

Net loan charge-offs increased to $53.9 million, or an annualized 0.23 percent of average net loans in the second quarter of 2007 compared to $46.0 million or an annualized 0.20 percent of average loans in the prior quarter.

The second quarter's loan loss provision totaled $60.0 million. The total reserve for credit losses was 1.19 percent of net loans at June 30, 2007, up one basis point from the previous quarter. Total non-performing assets at June 30, 2007, were $585.0 million, or 0.62 percent of loans and other real estate, compared to $422.5 million, or 0.45 percent at March 31, 2007. The increase in non-performing assets was driven partly by weaker demand for certain types of commercial real estate projects and also by the implementation of one set of more prescriptive credit policies, including extensive credit file reviews, ,for the combined company.

93.     On August 3, 2007, the Individual Defendants and E&Y caused Regions to file its interim financial report for the 2Q 07 with the SEC, which included substantially the same financial results previously reported on July 17, 2007. The Form 10-Q still-reflected Regions' goodwill balance for the quarter ending June 30, 2007 as $11+ billion, reporting that its goodwill was not impaired. As to Regions' "Allowance for Credit Losses," the 2Q 07 10Q stated that:

The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the portfolio as 01 June 30, 2007. The

allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities. The assessment of the adequacy of the allowance is based on the combination of both of these components ....

At June 30, 2007 and December 31, 2006, the allowance totaled approximately $1.1 billion. The allowance as a percentage of net loans was 1.19% at June 30, 2007 compared to 1.17% at year-end 2006. Net loan losses as a percentage of average loans (annualized) were 0.21 % in the first six months of both 2007 and 2006 ....

Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, including but not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level of the allowance in relation to total loans and to historical loss levels; (4) levels and trends In non-performing and past due loans; (5) collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their impact on credit performance.

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits.

For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $439.4 million at June 30, 2007, compared to $237.$ million at December 31,2006. . . . Within total impaired loans, $83.4 million of these loans had specific reserves of approximately $17.1 million at June 30, 2007. This compares to $70.1 million of impaired loans having specific reserves of approximately $17.6 million at December 31, 2006. While impaired loans increased, they are well-secured by real estate collateral.

94.     On November 9, 2007, the Individual Defendants and E&Y caused Regions to filed its interim financial report for the 3Q 07 with the SEC, which included substantially the same financial results previously reported on October 16, 2007. The Form 1O-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2007 as $11+ billion, reporting that its goodwill was not impaired.   As to Regions' "Allowance for Credit Losses," the 3Q 07 IOQ stated that:

> The allowance for credit losses ("allowance") represents management's estimate of probable credit losses inherent in the loan portfolio and off-balance sheet credit commitments as of September 30, 2007. The allowance consists of two components: the allowance for loan losses, which is recorded as a contra-asset to loans, and the reserve for unfunded credit commitments, which is recorded in other liabilities. The assessment of the adequacy of the allowance is based on the combination of both of these components ....
>
> At September 30, 2007 and December 31, 2006, the allowance totaled approximately $1.1 billion. The allowance as a percentage of net loans was 1.19% at September 30, 2007 compared to 1.17% at year-end 2006.  Net loan losses as a percentage of average loans (annualized) were 0.23% and 0.19% in the first nine months of 2007 and 2006, respectively . . . .
>
> Management's determination of the adequacy of the allowance is an ongoing, quarterly process and is based on an evaluation of the loan portfolio, Including but not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the level o/the allowance in relation to total loans and to historical loss levels; (4) levels and trends in non-performing and past due loans; (5) Collateral values of properties securing loans; (6) the composition of the loan portfolio, including unfunded credit commitments; and (7) management's judgment of current economic conditions and their impact on credit performance.
>
> Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and Special Assets are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the credit portfolio and the estimation of inherent credit losses in the loan portfolio. This comprehensive process also assists in the prompt identification of problem credits.
>
> For the majority of the loan portfolio, management uses information from its ongoing review processes to stratify the loan portfolio into pools sharing common risk characteristics. Loans which share common risk characteristics are assigned a portion of the allowance based on the assessment process described above. Credit

exposures are categorized by type and assigned estimated amounts of inherent loss based on the processes described above.

Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $431.1 million at September 30, 2007, compared to $237.5 million at December 31, 2006. The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report .... Within total impaired loans, $114.5 million of these loans had specific reserves of approximately $22.6 million at September 30, 2007. This compares to $70.1 million of impaired loans having specific reserves of approximately $17.6 million at December 31, 2006. While impaired loans increased, they are generally well-secured by real estate collateral

95.    On November 6, 2007, almost one year to the day after the AmSouth Acquisition, the Individual Defendants announced Moore would be retiring effective December 31, 2007, with Ritter replacing him as Chairman of the Board. The Company's release of that day stated that "[u]pon retirement from the company, Moore will be paid the remaining benefits under his employment agreement."

96.    On November 15, 2007, the Individual Defendants announced that Allen Morgan, Chairman of Morgan Keegan and a director and the Vice Chairman of the Regions Board was retiring from all three positions, effective December 31, 2007.

97.    On or about April 28, 2008, Regions filed a prospectus for its April 2008 Offering with the SEC which stated Regions had $141 billion in assets and $19.8 billion in shareholders' equity—including the $6 billion in goodwill attributable to the AmSouth Acquisition.   The Prospectus also expressly incorporated by reference Regions' Fiscal 2007 annual report, including (with E&Y's consent) E&Y's clean audit opinion, and certain other disclosures filed with SEC subsequent to the filing of the registration statement in May 2007.

98.    On October 22, 2008, the Individual Defendants disclosed that Regions had been invited to participate in the U.S. Government's TARP bailout program and that they intended to cause Regions to accept $3.5 billion in TARP funds.

99.     With its receipt of TARP funds, the investment community began scrutinizing Regions' financial statements. On October 23, 2008, *The Wall Street Journal* published an article entitled "Regions Financial Must Think We're All Stoned," which stated in relevant part:

> As of Sept. 30, Regions had a $1.5 billion loan-loss allowance, equivalent to just 83 percent of its nonperforming assets, which were $1.8 billion. A year earlier, Regions' allowance was at 175 percent of nonperforming assets. A year before that, it was at 249 percent.
>
> * * * * *
>
> Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets.  It's the reserve a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up.

100.    Despite criticism from the financial and investment community, the Individual Defendants continued reporting a grossly inflated value of the goodwill attributable to the AmSouth Acquisition, with its balance sheet materially overstating assets, shareholder equity and, as a result of not taking the impairment charge on the goodwill attributable to the AmSouth Acquisition, overstating Regions' income.

101.    For the 2008 audited financial, however, new information began to come to light. On January 20, 2009, before the market opened, Defendants announced Regions reported a net loss of $5.6 billion for the 4Q 08, stating the loss "was largely driven by a $6 billion non-cash charge for impairment of goodwill." Regions' January 20th release also disclosed:

> -- Accelerated disposition of problem assets, with approximately $1 billion in non-performing assets sold or transferred to held for sale, resulting in approximately $479 million of losses
>
> -- Net loan charge-offs rose to an annualized 3.19 percent of average loans
>
> -- Increased loan loss provision to $1.150 billion, $354 million above net charge-offs; raised allowance for credit losses to 1.95 percent of loans

102.    On this news, Regions' stock price fell off a cliff.  It dropped from $6.07 per share on January 16, 2009 to $4.60 per share on January 20, 2009—a one-day decline of approximately 25% on three times the average daily trading volume over the previous 30 days.

103.    The defendants' release stated, in relevant part, that the "results of goodwill impairment testing at the end of the fourth quarter indicated that the estimated fair value of Regions' banking reporting unit was less than its book value, requiring a $6 billion non-cash charge."

104.    Rather than some newfound liability or informational event, however, all that the write-down revealed about Regions was that the $6 billion value assigned to the AmSouth goodwill purchased in the acquisition was the product of longstanding impairment.

105.    On January 20, 2009, Bloomberg.com published an article entitled "Regions Plunges to 23-Year Low on $6.24 Billion Loss."  That article stated that Regions' stock drop "to $4.60 at 4 p.m., [was] the lowest price since March 13, 1985.  The bank has lost more than three-quarters of its market value in the past 12 months . . . . The lender almost tripled its reserves to cover bad debt to $1.15 billion in the fourth quarter from $358 million in the same period a year earlier. It had $1.7 billion in loans no longer collecting interest in the quarter."

106.    On January 20, 2009, TheStreet.com issued an article entitled "Regions Dividend at Risk After Posting Loss," which stated in relevant part:

> The noncash goodwill impairment charge represented premiums paid for acquisitions over the years, which most large banks are continually assessing in the current troubled environment.
>
> Excluding the charge, Regions Financial's net loss would have been 35 cents a share, but even that exceeded the Thomson Reuters consensus estimate of an 8 cent-per-share loss for the fourth quarter.

***

At first glance, it may appear that Regions Financial's asset quality improved during the fourth quarter, since the nonperforming assets ratios dropped to 1.26% from 1.45% the previous quarter. But the main reason for the drop in nonperformers was a huge increase in net loan charge-offs, with home builder and condominium loans comprising the bulk of the fourth-quarter loan losses.

\*\*\*

This means that if the pace of charge-offs continues at this level for the next few quarters, the company needs to continue its elevated levels of loan loss provisions, leading to more net losses.

107.    On January 23, 2009, the *Birmingham Business Journal* published an article entitled "Regions Financial's $6 billion write-down may start trend," which disclosed that Regions was seen by market makers as risky:

In an in-depth report on Regions released earlier this month, Audit Integrity said the company's accounting practices are considered "aggressive" and the company is at high risk of restating its quarterly earnings reports to account for losses it might not be disclosing in the present.

The firm's rating system found at least 10 red flags against Regions based on third quarter 2008 data and surmised that the company might be overvaluing its assets because of its large goodwill, assuming lower than usual liability risks on its pension compensation and for its high noninterest income compared to noninterest expenses.

\*\*\*

"Whether this (recent) write-down indicated that Regions has fully disclosed its risky or overstated assets is another question," Zwingli said.

"Until we see the quality and transparency of their disclosures improve, we would continue to anticipate further write-downs and unrealized losses in the quarters ahead."

108.    The Company's annual financial report on Form 10-K filed with the SEC on February 29, 2009 further disclosed that as a result of the massive impairment, Regions' corporate debt ratings were being dropped: "In February 2009, Regions Financial Corporation's senior notes, subordinated notes, and junior subordinated notes were downgraded to A3, Baa1, and Baa1, respectively, by Moody's, reflecting the Company's concentration in residential

homebuilder and home equity lending, particularly in Florida. Also, Moody's downgraded Regions Bank's long-term bank deposits, long-term debt, and subordinated debt to A2, A2, and A3, respectively."

    109.   The Company's Form 10-K finally made explicitly clear how much damage the Florida loan portfolio—a central asset obtained in the AmSouth Acquisition—was causing:

- Net charge-offs totaled $1.5 billion, or 1.59 percent of average loans in 2008 compared to $270.5 million, or 0.29 percent of average loans in 2007. The increased loss rate resulted from deteriorating economic conditions during 2008, especially related to - the housing sector. More specifically, approximately $639.0 million of 2008 net charges-offs were related to non-performing loan dispositions or transfers to held for sale as compared to none in 2007. Non-performing assets increased $853.9 million between December 31, 2007 and December 31, 2008 to $1.7 billion, primarily due to continued weakness in the Company's residential homebuilder portfolio, which began experiencing significant pressure toward the end of 2007. This pressure was due to a combination of declining residential real estate demand and resulting price and collateral value declines in certain of the Company's markets, particularly areas of Florida and Atlanta, Georgia. Condominium loans, mainly in Florida, were also a driver of the increase in non-performing assets. Regions aggressively managed its exposure to its most stressed assets by selling or transferring to held for sale approximately $1.3 billion of non-performing loans during 2008. Non-performing assets held for sale totaled $423.3 million at December 31, 2008.

- The majority of Regions' home equity lending balances was originated through its branch network and the Company has not purchased broker-originated or other third-party production. However, home equity losses still increased significantly in 2008, impacted by the unprecedented drop in real estate values coupled with a deteriorating economy. The main source of stress has been in Florida, where home values declined precipitously in 2007 and 2008. Further, losses on relationships in Florida where Regions is in a second lien position have been especially high; much higher, in fact, than the remaining areas of Regions geographic footprint.

- Housing continued to weaken considerably throughout 2008 and the risk of a deepening recession is significantly increasing due to the negative impact housing is having on the overall economy. Within the Regions footprint, the housing slowdown has been modest in some areas and severe in Florida and selected other geographical areas, including Atlanta, Georgia. Florida has experienced above-average price increases and construction activity in recent years. The slowdown is evident in many areas, including steeply declining sales and prices, and high levels of excess unsold inventory on the market. Management anticipates that the housing industry will remain weak throughout

2009. Housing-related issues have been exacerbated by a sharp increase in unemployment across Regions' footprint, particularly in Florida.

* * * * * *

•    Net charge-offs on home equity credits were also a driver of the increase, rising to 1.46 percent in 2008 versus 0.27 percent in 2007. Losses from Florida-based credits were particularly high, as property valuations in certain markets continued to experience ongoing deterioration. These loans and lines represent approximately $5.8 billion of Regions' total home equity portfolio at December 31, 2008.   Of that balance, approximately $2.1 billion represents first liens; second liens, which total $3.7 billion, were the main source of losses. Florida's second lien losses were 3.67 percent in 2008. Total home equity losses in Florida amounted to 2.83 percent of loans and lines versus 0.73 percent across the remainder of Regions' footprint.

•    Loans past due 90 days or more and still accruing totaled $554.4 million as of year-end 2008, an increase of $197.7 million from year-end 2007 levels, and reflected weaker economic conditions and general market deterioration. The increase was primarily due to increases in home equity and residential first mortgages, particularly in Florida, as well as commercial real estate loans being managed by the Special Assets• Department and in the process of collection.

•    At December 31, 2007, non-performing assets totaled $864.1 million, or 0.90 percent of ending loans, compared to $379.1 million, or 0.40 percent of loans, at December 31, 2006. The increase in non-performing assets was largely influenced by growth in non-performing loans in the fourth quarter of 2007 due to weakness in the residential homebuilder portfolio. This pressure was due to a combination of declining residential demand and resulting price and collateral value declines in certain of the Company's markets, particularly areas of Florida and Atlanta, Georgia.

110.    The true facts, which were known by the defendants but concealed from the investing public during the relevant period, and/or were omitted from the Merger Proxy and other relevant SEC filings and public statements, were as follows:

a.    AmSouth's decision to "double" its presence in the over-stimulated Florida real estate lending market between 2004 and 2006, coupled with AmSouth's lack of experience lending and servicing adjustable rate mortgages and the fact that it was keeping these loans on its own books rather than repackaging them and selling them to other investors, significantly increased the risk associated with the AmSouth assets and

diminished AmSouth's (and then Regions') ability to accurately calculate adequate loan loss reserves;

b.      AmSouth had failed to adequately reserve for mortgage-related exposure, causing its balance sheet and financial results to be artificially inflated;

c.      The five days the Individual Defendants permitted Regions' executives and financial advisors to conduct due diligence on the AmSouth acquisition was woefully deficient, rendering the fairness opinion by Merrill Lynch false and misleading;

d.      The more than $11 billion in "goodwill" the Individual Defendants and E&Y caused Regions to continue carrying on its books from the inception of the Acquisition on November 4, 2006 was grossly impaired (including the more than $6 billion worth attributable to the Acquisition);

e.      The Individual Defendants and E&Y failed to cause Regions to accurately and timely identify over $1 billion in "problem" and "non-performing assets"; and

f.      The AmSouth integration was not proceeding successfully.

111.    While Regions executives cashed in massive bonuses—mostly in violation of the regulations governing the Federal TARP program to which Regions applied—Plaintiff and the Class of investors were hung out to dry.

## CAUSES OF ACTION

**COUNT I:  *Violations of Section 14(a) of the Exchange Act and Rule 14a-9***
**(Against All Defendants)**

112.    The Plaintiffs incorporate the preceding paragraphs by reference as if alleged fully here.

113.    This cause of action is brought by plaintiff pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. section 78(n)(e), and Rule 14a-9(a) promulgated thereunder on behalf

of the Class members who held Regions stock that at the time the merger was consummated. This claim is brought against all defendants and does not sound in fraud.

114.     Section 14(a) of the Exchange Act provides that "it shall be unlawful for any person . . . in contravention of such rules and regulations as the [SEC] may prescribe . . . to solicit . . . any proxy or consent or authorization in respect of any security . . . registered pursuant to . . . this title."  15 U.S.C. § 78n(a).

115.     Rule 14a-9(a) promulgated thereunder provides that "no solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."  17 C.F.R. § 240.14a-9(a).

116.     Regions and AmSouth filed and disseminated the Proxy Statement seeking shareholder votes in support of Regions planned acquisition of AmSouth and outlined the factors giving rise to the merger and the conditions of the agreement.

117.     This Proxy Statement was false and misleading in that it failed to disclose material facts about the true value of the AmSouth Acquisition, as well as statements regarding the management of Regions on a going-forward basis.  These disclosures were necessary to make the disclosures that were made not misleading.

118.     The Defendants were negligent in disseminating the Proxy Statement with these materially false and misleading statements.

119.     The omissions and false and misleading statements in the Proxy Statement were material in that a reasonable shareholder would have considered them important in deciding how to vote on the merger.  In addition, a reasonable investor would have viewed a full and accurate

44

disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

120.    The omissions and false and inaccurate statements made in the Proxy Statement concerning the negotiation of the merger were material.

121.    Because of those facts, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) and are liable to Plaintiff and all other members of the Class who held stock in Regions at the time of the merger.

122.    Each shareholder has been damaged, in a total amount to be determined at trial, as a direct and proximate result of such violations, because they were denied the opportunity to make an informed decision in response to the proposed merger—one that they otherwise would not have approved.

**COUNT II:** *Violations of Section 20(a) of the Exchange Act*
**(Against the Individual Defendants)**

123.    The Plaintiffs incorporate the preceding paragraphs by reference as if alleged fully here.

124.    The Individual Defendants were controlling persons of the Company, and in certain instances legacy AmSouth, within the meaning of Exchange Act section 20(a).  Their positions with the Company and ownership of Regions and/or AmSouth stock granted the Individual Defendants the power and authority to cause Regions to release the false and misleading statements contained in the Proxy.

125.    The defendants, therefore, have violated section 20(a) of the Exchange Act and are liable for that violation.  By virtue of the foregoing, the individual defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF AND JURY DEMAND

126.   The Plaintiff demands the following judgment and request the following relief on

behalf of himself and the Class:

a.      An order of this Court that certifies this case as a class action under Rule 23;

b.      An award of damages, including interest, to the Plaintiffs and the Class;

c.      An award of reasonable costs and attorneys' fees to the Plaintiffs' counsel; and

d.      Any equitable, injunctive, or other relief that this Court may determine is just and

proper.

127.   The Plaintiff demands a jury trial on all of the issues in this case that are so

triable.


DATED:  October 2, 2009               WHATLEY DRAKE & KALLAS, LLC
                                      JOE R. WHATLEY, JR.


                                      /s/ Joe R. Whatley, Jr.
                                      JOE R. WHATLEY, JR.

                                      WHATLEY, DRAKE & KALLAS, LLC
                                      2001 Park Place N, Suite 1000
                                      Birmingham, AL  35203
                                      Telephone: (205) 328-9576
                                      Facsimile: (205) 328-9669

                                      Deborah Clark-Weintraub
                                      WHATLEY DRAKE & KALLAS, LLC
                                      1540 Broadway
                                      37th Floor
                                      New York, NY  10036
                                      (212) 447-7070



                                      Attorneys for Plaintiff

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL:**


REGIONS FINANCIAL CORPORATION
c/o CSC Lawyers Incorporating SVC Inc.
150 S. Perry Street
Montgomery, AL  36104

C. Dowd Ritter
780 River Oaks Drive
Cropwell, AL  35054

JACKSON W. MOORE
2022 Flowers Oak Cove
Germantown, TN  38138


IRENE M. ESTEVES
3810 Montrose Road
Birmingham, AL  35213

ALTON E. YOTHER
1223 Cove Lane S
Birmingham, AL  35216

BRYAN JORDAN
1827 Dr Hess Road
Bells, TN  38006


RONALD C. JACKSON
983 Esplanade Place
Memphis, TN  38106

RICHARD D. HORSLEY
6212 Cahaba Valley Road
Birmingham, AL  35242

ALLEN B. MORGAN
487 Goodwyn Street
Memphis, TN  38111


SAMUEL BARTHOLOMEW, JR.
3340 Helena Drive N
Huntsville, AL  35810

GEORGE W. BRYAN
8005 California Branch Road
Westpoint, TN  38486

MARGARET H. GREENE
35 Lafayette Drive
Atlanta, GA  30309


SUSAN W. MATLOCK
4221 Crescent Road
Birmingham, AL  35222

JORGE M. PEREZ
315 S Biscayne Blvd.
Miami, FL  33131

JOHN R. ROBERTS
18 Waverton
Saint Louis, MO  63124


MICHAEL STARNES
2226 Ross Avenue
Birmingham, AL  35226

LEE J. STYSLINGER
2826 Balmoral Road
Birmingham, AL  35223

ROBERT R. WALLER
591 Lexington Club Ct
Memphis, TN  38117


SPENCE L. WILSON
5863 Garden River Cove
Memphis, TN  38120

HARRY W. WITT
8960 Bay Colony Drive
Naples, FL  34108

O.B. GRAYSON HALL, JR.
131 Stonegate Dr.
Birmingham, AL  35242


EARNEST W. DEAVENPORT, JR.
402 Ocean Oaks Ct.
Johns Island, SC  29455

DAVID J. COOPER, SR.
17527 Scenic Highway 98
Fairhope, AL  36532

DONALD DEFOSSET
3203 Bayshore Blvd., Unit 1900
Tampa, FL  33629

JAMES R. MALONE
4423 Shorleaf Street
Las Vegas, NV  89119

CHARLES D. MCCRARY
1704 Indian Creek Drive
Birmingham, AL  35243

CLAUDE B. NEILSEN
2996 Park Brook Road
Birmingham, AL  35213

JOHN E. MAUPIN
750 Park Avenue
Atlanta, GA  30326

MERRILL LYNCH PIERCE
FENNER & SMITH, INC.
c/o The Corporation Company
2000 Interstate Park Dr., Ste 204
Montgomery, AL  36109

ERNEST & YOUNG, LLP
c/o Larry c. Mingledorf
Amsouth Harbert Plaza Ste 1900
1901 Sixth Avenue N, Ste 1200
Birmingham, AL  35203